26460. SMITH v. THE STATE.

DECIDED SEPTEMBER 9, 1937.

*West L. Cranford, J. G. Cranford,* for plaintiff in error.
*George R. Lilly, E. J. Clower,* contra.

GUERRY, J. This is a case wherein the State accused Willie Smith of the larceny of certain hogs belonging to R. M. Ham. He pleaded not guilty to the indictment, and the jury on the trial found against him. He excepted to the overruling of his motion for new trial, based only on the usual general grounds.

R. M. Ham, the prosecutor, testified that on March 1, 1936, he was the owner of the hogs described in the indictment, that these hogs were ranging on Tom's Creek and known as Sassafras Island—about eight or ten miles from Statenville, about two or three miles from Tarver; that on Monday, March 2, he missed the hogs, and after search found them at a stock-yard in Valdosta; that when he found them the marks on the hogs' ears had been very recently changed, their ears being bloody from the operation; and that the defendant had worked for him and had helped him handle hogs, and had helped him mark them and get them up in the fall. J. Y. Stokes testified that in March, 1936, he was engaged in the grocery and meat business; that sometime before Mr. Ham lost these hogs he saw the defendant and reminded him that he (witness) had had a fire and that he would like to collect his account; and that the defendant replied that he was financially depressed, but that he would try to catch up some hogs and bring them to him as payment. "The next time I saw him was at my store and he was in company with a fellow named Bird or Altman. He was the same man I identified in this court when he was tried in this court, and he was convicted as Lazarus Altman. They arrived at my place in the morning, between seven and eight o'clock and were traveling in a model-T Ford truck and they had some hogs on the back in a coop." Witness was approached by the defendant, who told him that he had some hogs out there belonging to his companion, whom he introduced to witness as Mr. Bird. "He asked me did I want to buy them and I told him yes, so Altman [Bird] and I went out to look at the hogs, and when we were out there examining them . . I discovered some marks on the ears that were freshly cut; and I remarked to Altman, I asked him what was the trouble, and he said the dogs chewed them when they were catching them." Witness suspected from the condition of the hogs' ears that something was wrong, and suggested to Altman that he take them to Carroll's stock-yards and turn them out of the coop where he could see them

better. This was done, and witness immediately observed that they were not chewed by dogs. "The hogs at that time appeared to have been cut with a knife of some type, a very smooth cut." Witness then asked the defendant if he knew that Bird (Altman) owned 'the hogs, and he replied that as far as he knew he did, that he merely brought them up there for Altman (Bird) "in the capacity of a carrier." Witness was still suspicious of the ownership of the hogs, and suggested to Bird (Altman) that he leave them there and if he found that he owned them he would trade with him the following Saturday. Altman (Bird) agreed to do this, and they all returned to the store of the witness, and he sold Altman (Bird) some groceries on credit, at defendant's request, and upon his guaranteeing the account. Neither Altman (Bird) nor the defendant ever returned to his store. Later in the day he learned that Mr. Ham had identified the hogs as his. Frank Stapleton, a carpenter, was doing some work in Mr. Stokes's store that morning. The defendant introduced Altman to him as Mr. Bird. He saw the hogs and noticed that their heads were bloody. He heard the conversation between Altman (Bird) and Stokes as to the sale of the hogs, and did not hear the defendant say the hogs were his, but did hear him say that he was hired by Altman (Bird) to haul them. Altman (Bird) told him that he bought the hogs from his brother in Lake City, Florida, and that in catching them the dogs had bitten their ears and defendant told him that he went with Altman (Bird) down to Lake City and got the hogs, and that the hogs were caught with dogs, and that that was the reason their ears were bloody.

B. L. Petty testified that on Sunday, March 1, about 4:30 in the afternoon he saw the defendant and Altman together, in the vicinity of Tarver, Georgia, "traveling in a little old model-T truck, and they had a dog on the truck and a crate on the back." At the time he saw them they were about six miles from the home of the defendant. W. D. Clayton testified that he recalled the time that Mr. Ham lost some hogs. "On Sunday night prior to the time I learned Mr. Ham had lost his hogs, I didn't see anybody, but heard a noise that attracted my attention. The noise was some hogs, which I heard distinctly, and they sounded like they were about at Willie's. That was around eight o'clock at night—eight or nine; and I heard the hogs and truck leave out

of there the next morning before day. . . I heard Willie Smith's truck come in that Sunday night. I had not heard any squealing before the truck got in. I did not hear any squealing after they left with the truck." W. W. Pennington, sheriff, testified that during March, 1936, he had a warrant for the defendant for the larceny of the hogs in question; that he attempted to execute it, but never did; that from the time the warrant came into his hands until the next time he saw the defendant was about six months; that he made search for him during that time; that defendant voluntarily surrendered to him at his office after the term of court at which Altman was tried and convicted. The defendant in his statement to the jury said that he owned the truck mentioned in the testimony; that Altman had done some work on this truck for him, and asked him to go with him to get some hogs belonging to Altman to sell; that he could not go but let Altman have his truck; that Altman came back about seven or eight o'clock that Sunday night with the hogs on the truck, and parked it under his shelter; that the next morning Altman came to his house, and they left there before day and took the hogs to Valdosta to Mr. Stokes's store; and that he did not know that they were stolen, and had nothing to do with the larceny.

Altman, companion of the defendant at Stokes's store and whom he introduced as Bird, has been tried and convicted of the theft of the hogs in question. We therefore may presume the guilt of Altman, and it only remains to be determined whether the evidence, which was circumstantial, was sufficient to exclude every reasonable hypothesis save the guilt of the defendant. Whether or not in a given case circumstances are sufficient to exclude every reasonable hypothesis save the guilt of the accused, is primarily a question for determination by the jury. This of necessity is so, for we have no legal yardstick by which we can ordinarily determine what in a given case is a reasonable hypothesis, save the opinion of twelve upright and intelligent jurors. After having heard the witnesses and having observed them testify, they are more capable of judging of the reasonableness of a hypothesis produced by the evidence, or the lack of evidence, and the defendant's statement, than is a court of law. However, this court as a court of law, where there appears a hypothesis from the evidence, or from the lack of evidence and the defendant's statement, point-

ing to the innocence of the accused, and which tested by all human experience is a reasonable one, may declare it so as a matter of law. There ·can be no doubt that the evidence throws a grave suspicion on the defendant. He is indicted, as a principal offender, for a felony. He therefore can not be convicted on evidence which merely shows him guilty as an accessory before or after the fact. The evidence must be sufficient to exclude every reasonable hypothesis save his guilt as a principal offender. The Code, § 26-501, declares: "A person may be principal in an offense in two degrees. A principal in the first degree is the actor or absolute perpetrator of the crime. A principal in the second degree is he who is present, aiding and abetting the act to be done; which presence need not always be an actual, immediate standing by, within sight or hearing of the act; but there may be also a constructive presence, as when one commits a robbery, or murder, or other crime, and another keeps watch or guard at some convenient distance."

In the present case it is inferable from the evidence that sometime Sunday afternoon, March 1, the hogs in question were stolen, and their marks altered. On that same Sunday afternoon the defendant was seen with Altman (already convicted of the larceny), near the vicinity where the hogs ranged, riding in defendant's truck, with a dog and a coop on the truck. This was about six miles from defendant's residence. We find the hogs being brought back on his truck to his house and left there during the night. We then find him leaving his house with Altman before day, with the hogs on the back of the truck in a coop, and arriving at Stokes's store in Valdosta, representing them to be the property of Altman, whom he introduced under the assumed name of Bird, and stating that they were for sale, but disclaiming any interest in the hogs except that he was hired "as a carrier" to bring them to town. Upon Stokes becoming suspicious of the ownership of the hogs because of the bloody condition of their ears, Altman told him that he had used dogs in catching them and that the dogs had chewed their ears. To another witness, who was present advising Stokes about the purchase of the hogs, Altman stated that he had bought the hogs from his brother in Lake City, Florida, and the defendant told the witness, in corroboration of Altman's story, that he had been to Lake City with

Altman to get the hogs, and that in getting them up the dogs had bitten their ears. The defendant then guaranteed to Stokes the payment of groceries sold to Altman on credit. Soon thereafter the defendant disappeared from his usual place of abode, and the sheriff was not able to locate him for six months, when he came in voluntarily and gave himself up. Does all of this evidence indicate that the defendant merely innocently loaned his truck to Altman, not knowing of his felonious intent, and that Altman went off in the truck alone and stole the hogs and brought them back to the defendant's house? The defendant does not explain why he was with Altman on the truck with a dog and a hog-coop about six miles from his home, on that Sunday afternoon, nor does he attempt to explain the purpose of the trip that he and Altman were then making. His statement was that he did not go off with Altman in the truck, but that Altman went off alone.

Is it not the most reasonable inference from the evidence that Altman and the defendant planned to steal the hogs, to use defendant's truck and hog-coop in doing so, to dispose of them as Altman's hogs (defendant being known to Stokes) under an assumed name, and then split the proceeds; and that in accordance with this plan they left defendant's house on Sunday afternoon with a dog (commonly used to catch hogs) and a hog-coop on the back of the truck, caught the hogs and brought them back to defendant's house after dark, and left there early the next morning before day, and attempted to dispose of them in Valdosta? Certainly it is strange (if he was innocent) that defendant states that Altman went off in his truck on Sunday alone, and returned with the hogs that night, and yet a witness testifies that he saw defendant in the truck with Altman late that afternoon about six miles from defendant's home, with a dog and hog-coop on the truck. Certainly it is strange that defendant introduced Altman to Stokes under an assumed name. Then, too, it is strange that after the theft of the hogs was discovered the defendant disappeared from his home, and could not be found by the sheriff for six months, when he came in and voluntarily gave himself up. The jury no doubt took into consideration all of these facts, and determined that he was guilty of stealing the hogs; and we would not feel justified in reversing their finding. This case has been here once before, and we then held that the evidence was insuf-

ficient to support the verdict against the defendant. However, on the second trial, the evidence was materially different from that produced on the first trial. Witnesses Stapleton, Petty, Clayton, and Pennington did not testify on the former trial. The only incriminating facts appearing against the defendant in the former trial were that he appeared in Valdosta with Altman with the hogs on his truck, and introduced Altman under an assumed name. The evidence now makes a different picture. We are of the opinion that the evidence, though entirely circumstantial, supported the verdict, and that the judge did not err in overruling the motion for new trial.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*